## Case No. 13,695.

SWIFT et al. v. BROWNELL et al.
BROWNELL et al v. SWIFT et al.
SWIFT et al. v. BROWNELL et al.

[Holmes, 467.] [1]

Circuit Court, D. Massachusetts. March, 1875.[2]

COLLISION — LIGHTS — NAVIGATION RULES — DAMAGES — ABANDONMENT — DEMURRAGE — LIMITED LIABILITY — EQUIPMENT AND SUPPLIES.

1. Neglect by a vessel having the right of way at night, to show the regulation-lights, does not relieve another vessel, meeting her, from the duty of observing the rules of navigation and using all practicable precautions to avoid a collision.

[Cited in The Mary Doane, Case No. 9,205; The Abby Ingalls, 12 Fed. 218; The Ada A. Kennedy, 33 Fed. 624.]

2. Where an experienced and capable master of a vessel badly injured by a collision at sea, himself a part owner of the ship and cargo, acting in good faith according to his own judgment and the advice of two other ship-masters, abandons the vessel and cargo, their value is to be taken as a total loss in estimating the damages by the collision, although the other vessel, almost as badly injured, succeeded in reaching a port of safety.

[Cited in The C. H. Foster, 1 Fed. 734; The Venus, 17 Fed. 926.]

3. In estimating the damage caused by a collision between two New Bedford whaling-ships in the Arctic Ocean, a cargo of bone and oil on one of them, there abandoned with the ship in consequence of the collision, is to be taken at its market value in New Bedford, at the time when it would ordinarily have arrived there, if

shipped at the time and from the place of the collision.

[Cited in Sheppard v. Philadelphia Butchers' Ice Co., Case No. 12,757; Dyer v. National Steam Nav. Co., Id. 4,225; Guibert v. The George Bell, 3 Fed. 585.]

4. The whaling equipment, provisions, and supplies of a whaling-ship, are not within the meaning of the words "ship or vessel" as used in section 3, of the act of March 3, 1851 (9 Stat. 635), limiting the liability of ship-owners in cases of collision to the value of their interest in the "ship or vessel, and her freight then pending."

5. There is no "freight pending" on a whaling voyage within the meaning of that act.

6. In estimating the damages to a ship on a whaling voyage caused by a collision, demurrage is to be allowed for the time she is in port undergoing repairs.

Admiralty appeals from a decree of the district court of Massachusetts, dividing the damages caused by a collision between the whaling-ships Ontario and Helen Mar, in the Arctic Ocean. [Case No. 10,543.] [They are cross libels by William O. Brownell and others against Jireh Swift, Jr., and others.]

Marston & Crapo, for owners of the Helen Mar.

Oliver Prescott and T. M. Stetson, for owners of the Ontario.

SHEPLEY, Circuit Judge. These cross-libels are promoted to recover damages consequent on a collision in the Arctic Ocean at ten o'clock at night, between the whale-ships Ontario and Helen Mar. A gale was blowing from the north-west, and both vessels were lying-to under storm-sails. The Ontario was close-hauled on the starboard tack under close-reefed maintopsail and fore-topmast-staysail, and the Helen Mar was close-hauled on the port tack, having set her lower maintopsail and foretopmast-staysail. Each vessel was making from one and a half to two and a half knots, much of it to leeward. The starboard bows of both vessels came in contact, each vessel losing foremast, main and mizzen topmast, and head-gear and anchors, and all the boats but one. The Ontario, with a valuable cargo of oil and bone, was necessarily abandoned. The Helen Mar was, in her disabled condition, brought safely out of the Arctic Ocean with a damage alleged at twenty thousand dollars. The night of the collision was intensely cold, with a north-west wind blowing a gale, with a clear sky, except during the occasional snow-squalls, when the intense cold precipitated the vapors in the air in flurries of snow. Except during these brief snow-squalls, the moon and stars were visible. The Helen Mar had the red and green lights required by the act of April 29, 1864. The Ontario, it is admitted, had not the statute lights, but it is claimed that she had a white light in a large Fresnel signal-lantern.

It does not seem to be questioned in this case that the Ontario had the right of way. Being absolutely close-hauled on the starboard tack, although by the rules it was her duty as well as that of the Helen Mar to port her helm, she could not port any more without going in stays, which is not required except in extreme cases. That the Ontario was in fault for not having the regulation-lights is clear. The evidence fails to prove that this fault was immaterial, but, on the contrary, is conclusive that it contributed to the disaster.

The Helen Mar was bound to port her wheel and go to the right. The law requires great vigilance on the part of the vessel bound to give way. The omission of the other vessel to exhibit the proper lights is insufficient to relieve her from the duty of observing the laws of navigation, and of using all practicable precautions to avoid a collision. This was the settled law before the enactment of the act of April 29, 1864. Chamberlain v. Ward, 21 How. [62 U. S.] 548. It is enacted in the twentieth article of that act, and has been, since the passage of the act, so held in The Gray Eagle, 9 Wall. [76 U. S.] 505. The Helen Mar did not port her wheel until too late to avoid the collision. Was this omission attributable solely to her inability to see the Ontario or to know her position and course by reason of the absence of the colored lights; or was it attributable partly to any inattention or neglect and want of proper lookout on the Helen Mar? Ought the Ontario to have been seen from the Helen Mar much earlier than she was seen, notwithstanding the absence of the colored lights? I think the evidence clearly proves that there was no snow-squall at the time of the collision, and had not been for fifteen minutes before. Not only the lights of the Helen Mar, but the vessel itself, were clearly seen from the Ontario a considerable time before the collision, and I am satisfied that the Ontario could have been seen from the Helen Mar when distant at least a quarter of a mile. If there was a forestaysail on the Helen Mar at the time of the collision, a fact which the evidence leaves in doubt, I do not think it would have obstructed the view of the lookout on the Helen Mar materially, and, if at all, only at intervals when the vessel was pitching. I do not, therefore, attach any importance to the question, so much discussed at the argument, whether or not the forestaysail was up. The Helen Mar had four men on deck besides the officer: two near the wheel, which was lashed but could be readily and quickly freed, and two on the lookout. The lookout were stationed amidships, because the Helen Mar was a wet ship, and with a north-west wind blowing a gale, and the temperature at nineteen degrees below zero, the spray freezing instantly, and with no topgallant forecastle or staging in the bow to accommodate the lookout, it was almost, if not quite, impossible to keep men at the bow. Yet from the vise-bench, where one of the men on the lookout was stationed, I think the Ontario could have been, and ought to have been,

seen sooner. What the reason was why the two men on the lookout did not see the Ontario sooner than they did, whether it was a momentary carelessness of the seamen, or a state of listlessness and indifference to passing events in the minds of men yielding to the numbing influence of the intense cold, we may not be able to discover. It is not often easy to discern, or necessary to know, why negligence existed in a given case. It is sufficient for purposes of judicial determination if we find the fact of negligence established. I think in the case of this collision neither party proves that "it has endeavored by every means in its power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident." See The Lochlibo, 3 W. Rob. Adm. 318. Here, then, is not a case of inevitable accident, but one of mutual fault; the fault of each contributing to a common calamity, the aggregate loss resulting from which is to be equally divided.

A question is presented whether the Ontario is entitled to have her total loss estimated, on the ground that she was abandoned, when, it is contended, she might have been navigated to a port of safety. Because the Helen Mar, in a condition of almost equal disability, succeeded in reaching the port of San Francisco, it is easy, with the wisdom which comes after the event, to contend that the Ontario might have done the same. But the master of the Ontario was experienced and of undoubted seamanship and capacity. He was a part owner in ship and cargo. He acted not only on his own judgment, but on the advice of two other masters of whalers in the Arctic Ocean. In good faith he determined that it was his duty rather to abandon the property of himself and his owners than to risk the lives of his crew. Placing ourselves in the position in which he was when called to determine, we ought to be slow in overruling the decision at which he arrived, and in which the other masters concurred. The true rule in estimating the value of the cargo of the Ontario is the restitutio in integrum. The injured party is to be made whole. He is to be as well off as if the injury had not been inflicted, and no better. "It is the actual damage sustained by the party at the time and place of the injury that is the measure of damages." Smith v. Condry, 1 How. [42 U. S.] 35. If there is a market value ascertainable at the time and place of injury, that market price governs. If, however, the article is of value to the owner, the wrongdoer does not escape by showing the absence, at the time and place of the injury, of a market for the article. Stickney v. Allen, 10 Gray, 352. There was no market price for the oil and bone in the Arctic Ocean. The true rule, so far as it goes, is stated in Bourne v. Ashley [Case No. 1,699]. "The market of New Bedford, which the witnesses and the assessor adopted, is the control-

ling market of the country, as well as the home port of both vessels, and furnishes the proper standard. The damages, then, will be the value at New Bedford, of the oil and bone * * * less the average necessary expenses of * * * freight, insurance, and the other usual charges, with interest on the sum thus arrived at." This rule is clearly a just one; but it seems clear to me that an error was made in the mode of applying it to the facts of this case. The value of the oil and bone was determined by the commissioner, as confirmed by the court, by taking the market price at New Bedford at the time of collision, and deducting freight, insurance, and other usual charges. But the price of bone and oil was exceptionally high at New Bedford at the time of the collision. By making the assessment at that price, the libellants receive what they could not have obtained by any possible combination of circumstances. They had oil and bone in the Arctic Ocean. To get it to a market, they must take time and incur expense. The value to them was what the net proceeds of the oil and bone would be after the expenses had been incurred and the time had elapsed necessary to reach a market. The element of time, it seems to me, is as much to be taken into account as the element of freight. There being no market in the Arctic Ocean at the time and place of collision, the article is constructively transported to a place where there is a market. We ascertain when it could reach the market, what it would produce on arrival over the cost of placing it there, and thus determine precisely what it was worth at the time and place of the injury. This is what the owner could have realized for it by freighting it to the market. As he could not have realized the exceptionally high price at New Bedford at the time of the collision, but only the price at New Bedford when he could get his articles there, the estimate should be based upon that price only which the article could command. If a cargo of powder be destroyed, destined for a port where by reason of war it commands an exorbitant price, it would not be reasonable to give the owner that exceptional price, when by no combination of circumstances it could have reached the port until the causes creating the exceptional price had ceased to be operative. I think, therefore, that, in applying the rule quoted from Bourne v. Ashley [supra], the New Bedford price of the bone and oil, adopted as a basis, should be the New Bedford price when the bone and oil could have reached the New Bedford market. This seems to have been the rule adopted by Judge Sprague in Taber v. Jenny [Case No. 13,720]. It certainly seems to be a rule of exact justice and precise restitution.

The commissioner to whom the assessment was referred reported the value of the cargo of bone and oil lost on the Ontario, at New Bedford prices in September, 1866, the

time of collision, after deducting expenses, to have been $52,554.04; and the value, computed at the market price of such commodities in New Bedford at the date it would probably have arrived there, if shipped immediately, deducting expenses, shrinkage, &c., in the same manner, at $34,647.67. The latter sum should be substituted for the former in making up the decree. The damage to the Ontario, as found by the commissioner, would then be $68,512.67, instead of $86,419.04, and the damage to the Helen Mar, including the general-average charges and demurrage, $20,422.28. So that, in order to equalize the damages, the Ontario would be entitled to the sum of $24,045.19, instead of $32,993.38, as found in the decree of the district court.

But as the liability of the owners of the Helen Mar for damage or injury by collision, by the provisions of the act of congress of March 3, 1851, "shall in no case exceed the amount or value of the interest of such owner or owners respectively in such ship or vessel and her freight then pending," it becomes necessary to determine the contributory value of the ship or vessel and her freight then pending. The liability is for the value of the vessel after collision, the act of congress having adopted the rule of the maritime law, and not the rule of the English statutes, on this subject. Norwich Co. v. Wright, 13 Wall. [80 U. S.] 104. It is contended in behalf of the Ontario that the value of the whaling equipment, at date of collision, is to be estimated in the value of the vessel. The commissioner has found this to have been $10,000; and the decree of the district court adding this to the $8,000, the value of the Helen Mar, after the collision, makes the estimated value of the ship at the date of collision $18,000.

The limitation of liability in the statute is the value "of the ship and her freight then pending." Does the word "ship," as used in the statute, include, in the case of a whaler, the whaling outfits, consisting of whaling-gear, casks, provisions and supplies for the crew, and trading, known as "slops"? That the word "ship" was intended to include the tackle, apparel, and furniture of the ship, I suppose, will hardly be questioned. In case of insurance, whaling equipment or fishing-stores are not considered as covered by a policy on the ship, or as a part of her tackle, apparel, and furniture. In construing the English statute (53 Geo. III. c. 159), Lord Stowell, in the case of The Dundee, 1 Hagg. Adm. 109, held the fishing-stores of a vessel engaged in the Greenland fisheries liable to contribute in compensation for damages done to another British ship by collision. But that learned judge did not so hold on the ground that the whaling implements or fishing-stores were included in the term "ship," or in the phrase, "ship, her tackle, apparel, and furniture." He states the question thus: "The only remaining question can be, whether the word appurtenances is properly applicable to fishing-stores on board of a fishing-vessel. It is a word of wider extent than 'furniture,' and may be properly applied to many things that could not be so described (with propriety at least) in a contract of insurance." He then proceeds to discuss what may properly be defined as appurtenances to a ship. The word "appurtenances," he states, must not be construed with a mere reference to the abstract naked idea of a ship; for that which would be an incumbrance to a ship one way employed would be an indispensable equipment in another; and it would be preposterous abuse to consider them alike in such different positions. You must look to the relations they bear to the actual service of the vessel. He held the fishing-stores of a whaler to be "appurtenances." So far from holding them to be included in the words "ship, her tackle, apparel, and furniture," he held that the seventh and eighth clauses of the act 53 Geo. III., in which the word "appurtenances" is introduced as subject to contribution, must be considered as explanatory of the first enacting clause, which subjects the ship, tackle, apparel, and furniture, and its freight, to contribution, thus proving that the obligation of that clause, as explained by the following clauses, was intended to embrace whatever could be fairly considered as the appurtenances of the ship. He adds: "It cannot be supposed that these following clauses introduce any inoperative word totally without meaning." Unless the word "appurtenances" be an inoperative word totally without meaning, it is, as Lord Stowell observes, a "word of wider extent than 'furniture;'" and the English statute, which subjects the ship and all her appurtenances to liability, is much broader in that particular than the act of congress, which limits the liability to the value of the ship and the pending freight. The question in the case of The Dundee was, "whether the word 'appurtenances' is properly applicable to fishing-stores on board a fishing-vessel." The question in the case pending is, whether the word "ship" is properly applicable to fishing-stores on board a fishing-vessel. It seems to me as clear that such stores are not "ship" in the case of a fishing-vessel, as that, in such case, they are appurtenances of the ship, and as clear that they are not included in our statute in the word "ship," as it is clear that they were included in the English statute in the expression "ship with all her appurtenances." The very nature of an appurtenance is that it is one thing which belongs to another thing. If the fishing-stores are "ship," they are not appurtenances of the ship.

The act of congress seems to have been drawn with direct reference to all the previous English statutes on this subject. The word "appurtenances," used in the seventh and eighth clauses of the act of 53 Geo. III.,

had, almost thirty years before the passage of the act of congress, received a construction by Lord Stowell in The Dundee. The court of king's bench, also, in Gale v. Laurie, 5 Barn. & C. 156, growing out of an application for prohibition in the case of The Dundee, had decided that the words "with all her appurtenances," in the seventh section of the act of 53 Geo. III., were to be considered as if inserted after the words "ship" and "vessel" in the first clause, and that fishing-stores were a part of the appurtenances of the ship. By the use of the words "ship" and "freight pending," and the omission of the word "appurtenances," used in the English statute after this construction had been given to it, congress clearly expressed an intention to limit the liability to the value of the ship, and that which is properly a part of the ship, her tackle, apparel, and furniture, and not to include that which is no part of the ship in the language of merchants, but only appurtenant to it as necessary for a special voyage or adventure. There is no "freight pending" in a whaling voyage; and the decree in the district court properly omitted any allowance for freight in the valuation of the Helen Mar.

In the estimate of damage to the Helen Mar by the collision, the commissioner allowed demurrage on the Helen Mar while under repair at San Francisco. The rule allowing demurrage, under such circumstances, is too well settled to be questioned. The sum allowed by the commissioner seems large; but the report is in all respects remarkable for its accuracy and ability; and, upon a mere question of fact as to amount, I do not feel disposed to disturb the conclusion of so competent a commissioner, after it has received the approval of an admiralty judge so careful and experienced, without a more clear preponderance of evidence against the finding than I can find from the testimony reported in this case. The Helen Mar, therefore, is to be valued immediately after the collision, without adding thereto the value of her whaling outfits, or any allowance for freight. The aggregate damages are to be divided. No cost is to be taxed for either party in the district court, and the Helen Mar is to recover the costs after the appeal. The decree of the district court, so far as it decrees that both parties were in fault, and the aggregate damages are to be divided, is affirmed, and so much of it as includes in the valuation of the Helen Mar her whaling outfits, as a basis for determining the extent of the liability of her owners under the statute, is reversed; and a decree is to be entered against the Helen Mar and owners for the sum of $8,000, with interest from the date of the collision. Decree accordingly.